UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                       :

RECLAIM THE RECORDS and BROOKE SCHREIER    :
GANZ,                                          :           18 Civ. 8449 (PAE)
                                         :
                           Plaintiffs,        :          OPINION & ORDER
                                         :
                     -v-                     :
                                         :

DEPARTMENT OF VETERANS AFFAIRS,        :
                                         :
                           Defendant.       :
                                         :
-----------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This lawsuit, brought under the Freedom of Information Act, 5 U.S.C. §§ 552 *et seq.* ("FOIA"), concerns a request by plaintiffs Reclaim the Records and its President Brooke Schreier Ganz (together, "Reclaim") for a subset of records contained in a Department of Veterans Affairs ("VA") database known as the Beneficiary Identification Records Locator Subsystem ("BIRLS"). Specifically, plaintiffs seek a copy of what the parties call the "BIRLS Death File," which contains information about VA benefits recipients who are now deceased.

Before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court grants in large part plaintiffs' motion for summary judgment—and denies the VA's cross-motion—and requests supplemental briefing on one issue.

# I.    Background[1]

## A.    The BIRLS Database and BIRLS Death File

The BIRLS database is an internal VA database maintained by the Veterans Benefits Administration ("VBA"), a division of the VA.  Herbert Decl. ¶ 4.  The BIRLS database "contains basic identifying information" about VA benefits claimants, including "social security numbers, dates of birth [and death], and military service information."  *Id.*  The sources of this information include VBA employees, who directly input data, as well as the Department of Defense and the Social Security Administration, which provide relevant information to the VBA. *Id.*

Each month the VBA provides the Veterans Health Administration ("VHA"), a separate division of the VA, with "a subset of BIRLS data for all those [v]eterans who have a death date" recorded in BIRLS.  Quinn Decl. ¶ 4.  The VHA has named this file the "BIRLS Death File." Although the "VHA is the data steward for the BIRLS Death File," the VBA is the custodian of the underlying BIRLS data used to create it.  *Id.*  In addition to the new entries, which are added on a monthly basis, the BIRLS Death File is "completely rebuil[t]" each year to "eliminate incorrect death dates that were later corrected by VBA staff" and to ensure that the information in the BIRLS Death File matches the corresponding data in the larger BIRLS database.  *Id.*

---

[1] These facts are drawn primarily from the declarations submitted by the parties in support of their motions for summary judgment: the Declaration of Deana Marakowski, Dkt. 26 ("Marakowski Decl."), and attached exhibits; the Declaration of John F. Quinn III, Dkt. 27 ("Quinn Decl."); the Declaration of Derek Herbert, Dkt. 28 ("Herbert Decl."); the Declaration of Sharanya Mohan, Esq., Dkt. 29 ("Mohan Decl."), and attached exhibit; and, the Declaration of David B. Rankin, Esq., Dkt. 36 ("Rankin Decl."), and attached exhibits.  Except where otherwise noted, the facts are undisputed.

## B.     The Ancestry.com FOIA Request and its Aftermath

In approximately January 2010, the VHA received a FOIA request from the genealogy website Ancestry.com seeking a copy of the BIRLS Death File.  Marakowski Decl. ¶ 11.  The VHA began processing this FOIA request in approximately June of that year.  Quinn Decl. ¶ 5.  "Because the BIRLS Death File did not contain health information protected by [HIPPA], and all the [v]eterans contained in the file were understood to be deceased, the VHA FOIA Office determined that VHA could release the [v]eterans' full name, social security number, date of birth, date of death, gender, cause of death, and up to three military branch assignments including start and separation date."  *Id.*  Given the format of the BIRLS Death File, it "could be quickly transformed into a portable data format requested by Ancestry.com."  *Id.*  "A properly formatted copy of the BIRLS Death File" was received by the VHA's FOIA Officer at the end of September 2010, and the data was released to Ancestry.com in March 2011.  *Id.* ¶ 6.  Because "VHA believed that annual updates of the [BIRLS Death File] data were implemented and that [the] source . . . data was generally accurate, including as to death status," VHA did not compare the BIRLS Death File against other data sources to validate the accuracy of the data."  *Id.* ¶ 5.

Later in 2011, "Ancestry.com posted the [v]eteran death information on its website" and offered veterans "a promotional discount membership to search [their] family history on its website in anticipation of Pearl Harbor Day."  *Id.* ¶ 6.  In mid-December 2011, the VA began receiving complaints that some of the veterans whose data—including their full name, date of birth, and social security number—was released to and posted on Ancestry.com were in fact still alive.  *Id.* ¶ 7.  A later analysis of the records released to Ancestry.com, conducted in just a few weeks using "other VBA data sources" and "data sources on VA contract," identified 5,223 living veterans whose records had been erroneously included in the 14.4 million records of purportedly deceased veterans released to Ancestry.com.  *Id.*

3

The VA worked with Ancestry.com to immediately remove these veterans' information from the website, and notified all of the veterans for whom it could find a mailing address of the data breach. *Id.* ¶ 8. The remainder of the dataset remains accessible on the Ancestry.com website to anyone with a membership. *See U.S. Department of Veterans Affairs BIRLS Death File, 1850–2010*, Ancestry.com (2011), https://www.ancestry.com/search/collections/2441/.

### C. Procedural History

#### 1. Reclaim's FOIA Request and Appeals

On September 20, 2017, Reclaim filed its FOIA request seeking a copy of the BIRLS Death File. Rankin Decl., Ex. 1 ("Reclaim FOIA") at 1. Reclaim described itself as "an activist group of genealogists, historians, journalists, and open government advocates who acquire genealogical and archival data sets and images from government sources, often through the use of [FOIA] laws" and "then upload [them] to the internet, making them freely available to the public and returning them to the public domain." *Id.* The FOIA request noted that the BIRLS Death File "is currently online" on "at least two major commercial genealogy websites" and "request[ed] a copy for [Reclaim], so that we may post it online for free public use." *Id.* Because Reclaim did not receive a response from the VA within the statutorily mandated 20 business days, *see* 5 U.S.C. § 552(a)(6)(A)(i), Reclaim filed follow-up emails on October 19, 2017; November 8, 2017; November 28, 2017; December 28, 2017; and January 8, 2018. *See* Marakowski Decl., Ex. C at 9–10.

On January 9, 2018, the VBA issued a letter responding to Reclaim's FOIA request for "a copy of the most current and complete BIRLS Death file." Rankin Decl., Ex. 2 ("VBA Denial"). The letter stated the VA's conclusion that the BIRLS Death File is covered by FOIA Exemption 6, 5 U.S.C. § 552(b)(6), which, in the letter's words, "permits [the] VA to withhold a document or information contained within a document if disclosure of the information would constitute a

clearly unwarranted invasion of a living individual's personal privacy." *Id.* at 1. Noting that the agency had been unable "to identify a countervailing public interest of sufficient magnitude to outweigh the privacy interest" implicated in the BIRLS Death File, the VBA FOIA officer denied the request in full on the basis of Exemption 6 and closed the matter. *Id.* at 2.

On April 6, 2018, Reclaim, now represented by counsel, appealed the VBA's denial of the FOIA request. Rankin Decl., Ex. 3 ("First FOIA Appeal"). Reclaim made three principal arguments. First, it argued that the BIRLS Death File is not covered by Exemption 6 because, at least as to data for the years 1850–2010, the information is already in the public domain. Second, Reclaim argued that the public's interest in the information in the BIRLS Death File outweighed the privacy interests protected by Exemption 6, particularly because the individuals whose records would be released are not, as the FOIA officer stated, "living individual[s]" but, by definition, are deceased. Third, Reclaim argued that even if some information in the BIRLS Death File was covered by Exemption 6, the VA had a duty to segregate and release the non-exempt records. *Id.*

On April 26, 2018, the Acting Chief Counsel of the VA's Information Law Group sent a letter to Reclaim's counsel. Rankin Decl., Ex. 4. She explained that, notwithstanding the VBA's denial of Reclaim's FOIA request, upon receipt of Reclaim's appeal the Office of General Counsel had "contacted the VBA FOIA Office and discovered that they were unclear on which office or entity within [the] VA was the custodian of that record." *Id.* at 1. The letter informed Reclaim that its FOIA request was being referred to the VHA in the first instance for a decision "as soon as possible," and that Reclaim would retain its right to appeal. *Id.* at 2.

On July 26, 2018, Reclaim received a decision from the VHA denying its request for the BIRLS Death File. Rankin Decl., Ex. 5 ("VHA Denial"). The decision rejected Reclaim's

public domain argument on the basis that the VBA had "erroneously" released the BIRLS Death File to Ancestry.com, including data on living veterans, which resulted "in a data breach of [veterans'] personal information." *Id.* at 1. FOIA, the decision reasoned, "does not require or mandate VHA to compound that mistake by continuing to provide the public with the BIRLS Death File previously released in error." *Id.* Having rejected Reclaim's public domain argument, the decision denied the request on the basis of Exemption 6, without engaging in a balancing test or addressing the possibility of segregating exempt from non-exempt data. *Id.*

On August 6, 2018, Reclaim appealed the VHA's denial of its FOIA request to the VA Office of General Counsel. Rankin Decl., Ex. 6. The next day, the VA acknowledged receipt of the appeal. Marakowski Decl., Ex. G.

## 2. This Litigation

On September 17, 2018, Reclaim filed this lawsuit to obtain compliance with its FOIA requests, Dkt. 1, and, the same day, its First Amended Complaint, Dkt. 2 ("FAC"). On December 17, 2018, the VA filed its answer. Dkt. 13. On March 14, 2019, on the joint request of the parties, the Court adjourned the initial pretrial conference and asked the parties to submit a joint letter identifying any issues that remained in dispute and proposing a summary judgment briefing schedule if necessary. Dkt. 18. On May 6, 2019, the parties filed their joint letter, Dkt. 19, and, on May 7, 2019, the Court adopted their proposed summary judgment briefing schedule, Dkt. 20.

On July 5, 2019, consistent with that schedule, the VA filed its motion for summary judgment, Dkt. 24, a memorandum of law, Dkt. 25 ("Def. Mem."), the Marakowski Declaration, the Quinn Declaration, the Herbert Declaration, and the Mohan Declaration. On October 11, 2019, Reclaim filed its cross-motion for summary judgment and opposition to the VA's motion for summary judgment, Dkt. 35, the Rankin Declaration, and an accompanying memorandum of

law, Dkt. 37 ("Pl. Mem."). On November 1, 2019, the VA filed a reply memorandum of law. Dkt. 38 ("Def. Reply Mem.").

### 3.    Actions by the VA After the Start of This Litigation

In October 2018, the VBA was notified that Reclaim had filed the FAC. Herbert Decl. ¶ 3. In December 2018, the VBA and the VHA "agreed to collaborate on the validation of the dataset" that had been released to Ancestry.com, "as a means of confirming" the accuracy of the data and ensuring that it "could be released in response to [Reclaim's] FOIA request." *Id.* ¶ 7. The divisions sought to do this both because the post-release inspection of the Ancestry.com dataset had been "done in an effort to cure the release of personal information [of] living veterans as expeditiously as possible" and because, as noted, "the BIRLS data underlying the BIRLS Death File is constantly updated, and . . . could have changed since 2011." Quinn Decl. ¶ 11. To validate the BIRLS Death File data, the VBA and VHA enlisted the technical assistance of the VHA's National Data Systems ("NDS") team. *Id.*

On December 12, 2018, NDS restored a copy of the same BIRLS Death File dataset that was sent to Ancestry.com in 2011. NDS then compared the 14.4 million records in the dataset against the December 2018 VHA Vital Status Master File ("Vital Status File"). *Id.* ¶ 13. "NDS did this by, in essence, comparing the social security number for each of the" veterans in the BIRLS Death File "to the social security numbers in the VHA Vital Status File." *Id.* The Vital Status File "only includes information about [v]eterans enrolled for health care or receiving health care" from the VA. *Id.* For those veterans included in the Vital Status File, the file draws on data from the Social Security Administration's Death Master File, the VA's Patient Treatment File, the Centers for Medicare and Medicaid Services, the VBA's BIRLS, and the VA's Master Veteran File. Herbert Decl. ¶ 7. To the extent there was a match, the "VHA provided available death information for those individuals from the Vital Status File." *Id.* "Nearly 78 percent of the

[14.4 million] individuals in the Ancestry.com release were not found in the December 2018 Vital Status Master File," however. Quinn Decl. ¶ 13. The VA represents that this was not a surprising result, because more veterans receive benefits from the VBA than receive healthcare from the VHA, such that they would be included in the Vital Status File. *Id.*

"Ultimately, NDS was able to locate information on [approximately 3.2 million] [v]eterans from the Ancestry.com FOIA release in the December 2018 VHA Master Vital Status File." *Id.* ¶ 15. Of this subgroup, some 4,200 veterans were listed as living in the December 2018 Vital Status file, notwithstanding their inclusion in the BIRLS Death File from seven years earlier.[2] *Id.* The comparison also revealed 36 individuals who were simultaneously listed as both living and deceased, and 427,300 individuals who had multiple, conflicting dates of death in their records. *Id.*

NDS also compared the 2011 BIRLS Death File data released to Ancestry.com with a December 2018 copy of the BIRLS Death File. *Id.* ¶ 14. This comparison revealed approximately 18,000 veterans who were included in the 2011 dataset but were no longer in the BIRLS Death File as of December 2018. *Id.* NDS was unable to determine the reason for this discrepancy. *Id.* NDS shared the results of its analysis with the VBA. *Id.* ¶ 15.

The VBA also conducted its own analysis of the data. The VBA compared the Ancestry.com dataset to the same Vital Status File described above; the BIRLS database; the VBA's Corporate Database, "the authoritative repository for claims[-]related information at the VA"; the VHA's Inpatient File, "the authoritative repository for all inpatient information at the

---

[2] It is unclear from the Quinn Declaration whether—because NDS was comparing the same dataset that was released to Ancestry.com—these 4,200 individuals are a subset of the 5,223 living veterans who were identified shortly after that data was posted on the Ancestry.com website.

VA"; and the VHA Administrative Data Repository, a "VHA repository of identify management, demographic, and eligibility information to which" the VBA has access. Herbert Decl. ¶ 8.

The VBA ultimately concluded that 5,017,533 records of the 14,470,452 records previously released to Ancestry.com were "valid" records such that the agency was confident that the veteran was deceased and the record could released under FOIA. *Id.* ¶ 9. The VBA set the following criteria to make this determination: A given veteran needed to have (1) matching dates of death in (2) at least two of the sources described above, with (3) no conflicting death dates in the various sources and (4) no data source indicating that the individual was still alive. *Id.* ¶ 8. For the approximately 35% of the records previously released to Ancestry.com that were deemed valid, the VA released the following data to Reclaim: gender, birth date, death date, social security number, up to three branches of service, enlistment date(s), and release date(s).[3] *Id.* ¶ 9. The VA did not disclose data in the "cause of death" field for any of the records, despite the previous inclusion of this information in the Ancestry.com dataset, "because different data sources contained contradictory information, and [the] VBA only validates causes of death when needed to provide benefits to [v]eterans and dependents." *Id.* On April 11, 2019, the VA released the approximately 5 million validated records to Reclaim. Mohan Decl., Ex. A.

The agency then conducted an analysis of another subset of the BIRLS Death File: records for veterans with a recorded death date between January 1, 2010 and April 3, 2019, *i.e.*, records which had been added since the Ancestry.com FOIA release. Herbert Decl. ¶ 10; Quinn Decl. ¶ 16. This dataset included records for approximately 3.2 million veterans. Quinn Decl. ¶ 16. NDS determined that the quality of this data was "very poor." *Id.* For example, more than

---

[3] While not explicitly stated in the Herbert Declaration, the Court assumes that the data also included the veterans' full names, as in the dataset released to Ancestry.com. *See* Quinn Decl. ¶ 5.

a third of the records listed a date of *birth* after April 4, 2019, the day the dataset was analyzed. *Id.* NDS also determined that 41% of the 3.2 million records in this dataset had a recorded birth and death date that yielded an age-at-death of younger than 16. *Id.* And some of the records contained veterans whose listed birth dates were later in time than their listed death dates. *Id.* "Altogether, about 45 percent of the post-Ancestry.com BIRLS [Death File] data . . . had some sort of error apparent [on] the face of the data." *Id.*

NDS nevertheless attempted to verify this data with the VHA's Vital Status File, again using the veterans' social security numbers. *Id.* ¶ 17. Of the approximately 2.2 million veterans who also had a record in the Vital Status File, 22,483 were listed as living, and 207 veterans were listed as both living and deceased in the Vital Status File. *Id.* NDS also discovered 132,323 individuals with multiple, conflicting death dates listed in their Vital Status File. *Id.*

Ultimately, the "VBA determined that the post-Ancestry[.com] data was so error-filled that it could not feel confident that the use of the same cross-referencing efforts and criteria for release [it had applied to the 1850–2010 dataset] would identify those veterans with BIRLS death dates who were, in fact, deceased." Herbert Decl. ¶ 11. The VA has therefore not released any post-2010 data from the BIRLS Death File to Reclaim. The parties' cross-motions for summary judgment were filed against this backdrop.

## II.    Applicable Legal Standards

### A.    Summary Judgment Motions in General

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## B.     Summary Judgment Motions Under FOIA

FOIA governs public access to information held by the federal government. "The basic purpose of FOIA is to ensure an informed citizenry, [which is] vital to the functioning of a democratic society, [and] needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (citation omitted). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the

public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (citations omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's justifications *de novo*. *Id.* Even if portions of a responsive record are properly exempt, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II); *see FBI v. Abramson*, 456 U.S. 615, 626 (1982).

Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response. *See, e.g.*, *Johnson v. CIA*, No. 17 Civ. 1928 (CM), 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the [G]overnment's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a

FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted).

Here, the VA invokes only FOIA Exemption Six, which is applicable to records that implicate personal privacy, to justify its withholdings of the BIRLS Death File.  The Court first addresses the applicability of Exemption 6 to the 1850–2010 BIRLS Death File, and then considers its applicability to the post-2010 data.

III.    **Discussion**

    A.    **1850–2010 BIRLS Death File**

        1.    **Public Domain Doctrine**

The Court first considers whether the public domain doctrine applies to the BIRLS Death File data that was released by the VA to Ancestry.com in 2011 and, save for some 5,000 records, remains accessible to users of that website to this day.

Under the "public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).  This is because "if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes." *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999).  This rationale extends to FOIA Exemption 6.  *See, e.g.*, *Parker v. U.S. Dep't of Justice, Office of Prof'l Responsibility*, 278 F. Supp. 3d 446, 454 (D.D.C. 2017).  However, "[a]n individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." *Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994).  Thus, under the public-domain doctrine, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.  The ultimate burden of persuasion,

to be sure, remains with the [G]overnment, but a party who asserts that material is publicly available carries the burden of production on that issue." *Davis v. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (internal quotation marks and citation omitted).  To satisfy this burden, a plaintiff "must show that the information requested is as specific as the information previously released, that it matches that information, and that it has already been made public through an official and documented disclosure." *Bartko v. U.S. Dep't of Justice*, No. 13 Civ. 1135 (JEB), 2015 WL 9272833, at *8 (D.D.C. Dec. 18, 2015), *aff'd in part, remanded in part*, 898 F.3d 51 (D.C. Cir. 2018).

Here, the Court finds that Reclaim has met its burden of production as to the 1850–2010 dataset.  Reclaim is requesting the same information, at the same level of specificity, as was disclosed to Ancestry.com through its 2011 FOIA request, and that information remains accessible to the public via the Ancestry.com website.  The VA does not seriously claim otherwise.  Instead, it argues that the disclosure of this data was "erroneous" and "inadvertent," and therefore should be treated differently.

The cases on which the VA relies, however, are easily distinguished.  In *Halloran v. Veterans Administration*, the plaintiff sought unredacted transcripts of conversations which had been secretly recorded during a public corruption investigation.  874 F.2d 315, 317–18 (5th Cir. 1989).  The district court ruled, in part, that to the extent the recorded conversations involved multiple individuals, "no invasion of privacy could occur because the information was already 'known to the public.'"  *Id.* at 322.  The Fifth Circuit rejected this argument, reasoning that "otherwise-private information may have been at one time or in some way in the 'public' domain does not mean that a person irretrievably loses his or her privacy interests in it."  *Id.*  Here, in

contrast, the Court has found that the Reclaim has met its burden of production with regard to the public-domain doctrine. The records at issue have been in the public domain since late 2011.

Also inapposite is *U.S. Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749 (1989) ("*Reporters Comm*"). There, the Supreme Court held that individuals retained a privacy interest in an FBI rap sheet, notwithstanding the fact that it was a compilation of otherwise publicly available data from sources across the country. *Id.* at 764 (recognizing a "distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole" and noting that "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information"). Here, in contrast, the data sought by Reclaim is no more aggregated than—and in fact tracks exactly—the information that was previously released to Ancestry.com.

Finally, the two district court cases cited by the VA are also unhelpful. *Nat'l Immigration Law Ctr. v. U.S. Immigration & Customs Enf't*, No. 14 Civ. 9632 (PSG), 2015 WL 12684437 (C.D. Cal. Dec. 11, 2015); *Blackwell v. FBI*, 680 F. Supp. 2d 79 (D.D.C. 2010). At least as revealed by the opinions, neither involved the context here: an agency's prior release of information pursuant to a FOIA request, the entirety of which the agency later argues to have been produced erroneously.

Accordingly, the public-domain exception applies to the data released to Ancestry.com, save for the approximately 5,000 records which were subsequently taken down and therefore are no longer in the public domain. While "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable

under a FOIA exemption," *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007), that concern is solely theoretical here, insofar as the same information is available—and has been for nine years, pursuant to an agency FOIA disclosure—on a readily accessible public website that the VA is making no attempt to strip of such information.

### 2. Applicability of FOIA Exemption 6

In any event, the Court separately holds that Exemption 6 does not apply to the data here. The FOIA request at issue arises in an unusual posture. Not only do the parties agree that the records in dispute exist and are within the VA's control, they also appear to agree that the BIRLS Death File, to the extent it is accurate, is *not* subject to Exemption 6—or any other FOIA exemption—and can be released pursuant to a public records request. Indeed, as discussed above, the VA has already released approximately one-third of the records in the BIRLS Death File to Reclaim.[4] Both parties also appear to agree that to the extent any of the records in the BIRLS Death File pertain to a *living* veteran, they are properly withheld under Exemption 6, and the Court does not understand plaintiffs to seek such records.

The dispute here, then, turns on the VA's position that, because it lacks confidence in the accuracy of the remaining 9.4 million records, it should not be compelled to release any of them to Reclaim. The VA argues that it has taken sufficient steps to determine the accuracy of the records, specifically the death-date of the veterans therein, and should not be forced to undertake further time- and labor-intensive efforts that may ultimately not yield more accurate results. The VA therefore argues that it may properly withhold the remaining records under Exemption 6, because among them may be records relating to living veterans.

---

[4]The VA has not released "cause of death" data for any of the records, however. The Court addresses this issue separately, *infra*.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). When an agency invokes Exemption 6, a court "must first determine whether the[] disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest. If no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Emp.'s v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). "If, on the other hand, a substantial privacy interest is at stake, then [the court] must weigh that privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy." *Id.*; *cf. Reporters Comm.*, 489 U.S. at 762 (applying balancing test to disclosures under Exemption 7(C)).

In support of its position, the VA analogizes to cases analyzing a different exemption, FOIA Exemption 7(C). That exemption allows the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such [information] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). One such area where agencies routinely redact information pursuant to Exemption 7(C) is the names of third parties referenced in law enforcement notes or reports. "In deciding whether the release of particular information constitutes an 'unwarranted' invasion of privacy," under Exemption 7(C), "an agency must balance the privacy interest at stake against the public interest in disclosure." *Davis v. Dep't of Justice*, 460 F.3d 92, 97 (D.C. Cir. 2006). That is because, "as a general principle, persons involved in [law enforcement] investigations—even if they are not the subject of the investigation—have a substantial interest in seeing that their participation remains secret." *Schoenman v. FBI*, 576 F. Supp. 2d 3, 9

(D.D.C. 2008) (internal quotation marks omitted) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 767

(D.C. Cir. 1990)).  At the same time, in the Exemption 7(C) context, federal courts "have

recognized that the privacy interest in nondisclosure of identifying information may be

diminished where the individual is deceased.  Indeed, the fact of death[,] while not requiring the

release of information, is a relevant factor to be taken into account in the balancing decision

whether to release information." *Davis*, 460 F.3d at 98 (internal citations, quotation marks, and

ellipsis omitted).  The Government's obligation in such circumstances is to "ma[k]e a reasonable

effort to ascertain life status," and "the proper inquiry is whether the Government has made

reasonable use of the information readily available to it, and whether there exist reasonable

alternative methods that the Government failed to employ." *Schrecker v. U.S. Dep't of Justice*

(*Schrecker II*), 349 F.3d 657, 662 (D.C. Cir. 2003).  The VA argues that, in this case, it has made

reasonable use of the information sources at its disposal to cross-check the records in the BIRLS

Death File to determine whether the persons therein are living or dead, and that no other

reasonable methods are available to it.

This argument falls short for at least two reasons.  First, notwithstanding similarities—

both exemptions guard against the disclosure of private individuals' personal information, and

both require a court to conduct a balancing test—Exemptions 6 and 7(C) are not interchangeable.

On the contrary, as the Supreme Court has recognized, "Exemption 7(C)'s privacy language is

broader than the comparable language in Exemption 6 in two respects":

> First, whereas Exemption 6 requires that the invasion of privacy be "clearly
> unwarranted," the adverb "clearly" is omitted from Exemption 7(C).  This
> omission is the product of a 1974 amendment . . . .  Second, whereas Exemption 6
> refers to disclosures that "would constitute" an invasion of privacy, Exemption
> 7(C) encompasses any disclosure that "could reasonably be expected to
> constitute" such an invasion.  This difference is also the product of a specific
> amendment.  Thus, the standard for evaluating a threatened invasion of privacy

interests resulting from the disclosure of records [covered by Exemption 7(c)] is somewhat broader than the standard applicable to [Exemption 6].

*Reporters Comm.*, 489 U.S. at 755–56 (footnotes omitted).  Consistent with this interpretation, courts have held that "Exemption 6 'tilt[s] the balance (of disclosure interests against privacy interests) in favor of disclosure,' and creates a 'heavy burden' for an agency invoking Exemption 6." *Charles v. Office of the Armed Forces Med. Exam'r*, 935 F. Supp. 2d 86, 97 (D.D.C. 2013) (quoting *Morley v. CIA*, 508 F.3d 1108, 1128 (D.C. Cir. 2007)).  "Exemption 6 does not protect against disclosure every incidental invasion of privacy[,] only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy." *Dep't of Air Force v. Rose*, 425 U.S. 352, 382 (1976).

Second, Exemption 7(C) applies in the distinct factual context of law enforcement investigations—quite often, historical or closed investigations.  In that context, the personal identifying information at issue frequently is associated with third parties: for example, victims, witnesses, informants, or subjects or targets of investigations.  The law enforcement agency may well not have a longstanding relationship with these parties.  It may not have had any history at all, let alone any recent ongoing contact, with the persons whose alive-or-dead status the agency is charged with attempting to verify in determining whether Exemption 7(C) applies.  Not surprisingly, in this context, courts have obliged agencies to take reasonable steps—limited to existing sources of data—to verify whether the third party is deceased.  No further inquiry is required.  A duty to do more by way of verification, courts have recognized, could impose a burden on agencies vastly disproportionate to the duration or depth of the law enforcement agency's relationship with the third party.  *See, e.g.*, *Schrecker II*, 349 F.3d at 662, 664–65.

Courts have also recognized "that the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation,"

giving rise to "a substantial interest in seeing that their participation remains secret." *Id.* at 666

(internal quotation marks and citations omitted). For this reason, the D.C. Circuit has "adopted a

categorical rule permitting an agency to withhold information identifying [living] private citizens

mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or

refute compelling evidence that the agency is engaged in illegal activity.'" *Id.* at 661 (quoting

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)); *see also Nation Magazine

v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (explaining and reaffirming the

*SafeCard* rule). In contrast, no such prophylactic rule exists for Exemption 6.

The context of this FOIA request is far afield from that of ancillary references to third

parties in law enforcement reports, where for reasons of privacy and administrative economy a

categorical rule has been developed that permits the withholding of information regarding living

persons. The BIRLS Death File does not implicate the same privacy sensitivities as references to

a third party in an FBI memorandum or case file. And the information at issue in the request is

central to the administrative file, not collateral to it in the way that a reference to a third party

may be in a law enforcement memo. The BIRLS Death File concerns the records of veterans

who directly engaged with the VA, by receiving VA benefits at some point before their death. In

many, if not most, cases, the termination of benefits was presumably triggered by the veteran's

death. The information contained in the BIRLS, from which the BIRLS Death File is derived, is

important to the VBA's ability to carry out its mission.

The Exemption 7(C) authority on which the VA relies is thus of only tenuous persuasive

authority here.

In any event, application of Exemption 6 here clearly disfavors withholding. The VA has

already produced some 5 million records from the BIRLS Death File. By this action, the VA has

implicitly acknowledged either that (1) assuming that this data did implicate a substantial privacy interest, it is outweighed by the public value of release of such records; or (2) the exemption does not apply.  And in this litigation, the VA has not taken the position—nor could it, in light of its actions—that Exemption 6 applies to the BIRLS Death File records of deceased veterans. Therefore, with no other exemption applicable, such records must be released to Reclaim.

The VA is instead asking for latitude under Exemption 6 to allow it to withhold production of the balance of the BIRLS Death File for a reason that appears unprecedented in the case law: based on the shoddy quality of the agency's recordkeeping.  In essence, the VA has carelessly commingled, into a FOIA-producible database intended to be comprised exclusively of the records of dead people, records relating to some living persons—and is finding it burdensome to separate the living from the dead.  It accordingly seeks leave not to produce the balance of the database at all, including the considerable portion thereof that all concede is properly producible under FOIA.

Neither FOIA nor the assembled case law provides any charter for this bold bid.  To be sure, the VA is at liberty to use its best efforts to redact or otherwise siphon out the portions of that database that it determines relate to living persons and hence are exempt under Exemption 6. The Court will afford the VA reasonable time to undertake such efforts.  But the FOIA statute does not give an agency license to broadly withhold non-exempt records because the agency has errantly commingled them with exempt records.  The VA does not cite any case authority permitting an agency to invoke an otherwise unavailable exemption because its own carelessness has complicated the process of separating exempt from non-exempt materials.  And a judge-made rule permitting over-withholding in such circumstances would disserve important interests.  It would incentivize agencies to maintain records sloppily.  And it would contravene

FOIA's purposes. As the Supreme Court has "repeatedly emphasized, the [FOIA statute] is broadly conceived and its basic policy is in favor of disclosure." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220 (1978) (internal quotation marks and citations omitted). Congress "carefully structured nine exemptions from the otherwise mandatory disclosure requirements in order to protect specified confidentiality and privacy interests. But unless the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public." *Id.* at 220–21 (footnote omitted). None of these exemptions fits here.[5]

To be sure, the Court is acutely sensitive to the potential harm to living veterans that could come with the wholesale release and subsequent publication of their personal identifying information. *See Wolf*, 473 F.3d at 378. It is in no way their fault that the agency charged with serving them has failed to organize its records in a way that facilitates safeguarding their privacy. The Court will therefore give the VA two years, until April 1, 2022, to complete the process of producing the BIRLS Death File, or its functional equivalent,[6] to Reclaim, with data relating to

---

[5] Even if the Court had latitude to fashion a new exemption for such circumstances, this would not be an apt case in which to do so, given the continued availability of the same dataset in the public domain, via Ancestry.com.

[6] The Herbert Declaration notes that the VA "is in the process of retiring BIRLS" in favor of its "Corporate Database." Herbert Decl. ¶ 12. Although this change of format does not relieve the VA of its FOIA obligations with respect to the records, if the VA is able to provide Reclaim with the same data contained in the BIRLS Death File—the "full name, social security number, date of birth, date of death, gender, cause of death, and up to three military branch assignments including start and separation date," for veterans who died between 1850 and 2010, *see* Quinn Decl. ¶ 5—from another source, there would not appear to be any legal impediment to the VA's producing the same data in this format. If the VA wishes to produce data in this manner, the Court expects it promptly to notify Reclaim and for the parties to submit a joint letter memorializing their agreement to the use of this format—or identifying any differences of view as to this point.

living persons redacted or otherwise removed.  This lengthy period will ensure that the records produced are coterminous with the VA's FOIA obligations.

### 3.      The "Cause of Death" Data Field

Although the VA has thus far released data for 5 million deceased veterans pursuant to Reclaim's FOIA request, it has withheld data from the "cause of death" field for all records it has released.  "Cause of death" data was previously released to Ancestry.com for all 14 million records in the BIRLS Death File.  Quinn Decl. ¶ 5.  The VA now asserts, however, that this data cannot be released for any veteran included in the BIRLS Death File, "because different data sources contained contradictory information, and [because the] VBA only validates causes of death when needed to provide benefits to [v]eterans and dependents."  Herbert Decl. ¶ 9.

The Court requires additional information to resolve this dispute.  The parties' briefing has left unclear, *inter alia*, how detailed the data in the "cause of death" field is, and the extent to which the formulations there are standardized or customized.  According to the summary of the BIRLS Death File dataset on Ancestry.com, this data field states that a given veteran's cause of death is one of "unknown, natural, combat, [or] other."  *See U.S. Department of Veterans Affairs BIRLS Death File, 1850–2010*, *supra*.  If this summary is accurate and complete, the "cause of death" data field appears to be cursory and no more revealing than the other data regarding deceased veterans already released to Reclaim.  However, given the potential sensitivity of such data, the Court wishes to confirm, before ruling, its understanding as to how this data field comes to be filled and whether it is ever filled with any information other than the four labels above. The VA is therefore directed, within three weeks of the issuance of this Opinion, to file a letter on ECF explaining the nature of the data in the "cause of death" field.  If necessary, Reclaim may file a brief letter in opposition one week later.

23

### B.    Post-2010 Data from the BIRLS Death File

Finally, the Court turns to the subset of the BIRLS Death File containing data for veterans who have passed away since 2010. As noted, the VA's assessment was that, on the issue whether a veteran listed in this subset of the file has been correctly listed as deceased, the quality of the VA's data is even less reliable than as to the 1850–2010 dataset. The VA argues that no data in this file should be released because, ostensibly, Reclaim's FOIA request did not seek this subset of data. That is wrong. Reclaim's original FOIA request stated, without qualification, "[w]e request a copy of the Beneficiary Identification Records Locator Subsystem (BIRLS) Death File, a very large database maintained by your agency." Reclaim FOIA at 1. The VA argues that, in the course of justifying this request, Reclaim's request went on to note that "[t]his data has already been made available to the public before, and it is currently online at . . . Ancestry.com." *Id.* But that explanatory statement is not fairly read to place a time limit on the scope of Reclaim's request for "a copy of the [BIRLS] Death File." And, notably, the VA did not construe Reclaim's request to exclude 2010–Present data. On the contrary, in the first denial letter issued by the VBA, the FOIA officer wrote, "[t]his letter is in response to your [FOIA request] . . . in which you are seeking a copy of the most current and complete BIRLS Death File." VBA Denial. The Court therefore finds that Reclaim's FOIA request has always sought the data contained in the BIRLS Death File through the present.

Although the VA might have sought to distinguish the 2010–Present data from the earlier data on the ground that the more recent dataset has not been released to Ancestry.com, it has not done so. Instead, it makes the same Exemption 6 argument rejected above: that based on its problematic recordkeeping, it cannot confidently verify the death status of the veterans in the post-2010 dataset. The Court's ruling as to the earlier data applies with equal force here. The Court therefore concludes that the post-2010 data must similarly be released to Reclaim. For the

same reasons discussed above, the Court directs the VA to release these records, or their functional equivalent, to Reclaim by April 1, 2022.

**CONCLUSION**

For the foregoing reasons, the Court grants Reclaim's motion for summary judgment and denies the VA's cross-motion for summary judgment. Consistent with this Opinion, the VA is to release the remainder of the BIRLS Death File to Reclaim by April 1, 2022. The Court expects the VA to use the period between now and April 1, 2022, to remove data from the BIRLS Death File relating to living persons.

As explained in the foregoing Opinion, the Court requests supplemental letter briefing, on the schedule set out above, regarding the "cause of death" data field, to enable the Court to resolve the parties' dispute as to whether that field is properly disclosed under FOIA.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 24 and 35.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 24, 2020
       New York, New York